UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA       :

     – v. –                               :       17 Cr. 503 (AJN)

RODOLFO SABLON,                   :

                Defendant.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## THE GOVERNMENT'S SENTENCING MEMORANDUM


                                                                              GEOFFREY S. BERMAN
                                                                              United States Attorney
                                                                              Southern District of New York
                                                                              Attorney for the United States of America

Andrea M. Griswold
Assistant United States Attorney
      - Of Counsel -

# TABLE OF CONTENTS

| | | |
|---|---|---:|
| I. | Offense Conduct | 2 |
| | The Moode-Siva Tipping Chain | 3 |
| | The Rivas-Zoquier-Rogiers Tipping Chain | 4 |
| II. | Procedural Status of the Defendants | 5 |
| III. | The Guidelines Calculation | 6 |
| IV. | The Section 3553(a) Analysis | 7 |
| | The Nature and Circumstances of the Offense and the Need to Provide Just Punishment | 7 |
| | The Need for Deterrence and to Promote Respect for the Law | 8 |
| V. | Defendant's Arguments | 10 |
| CONCLUSION | | 13 |

**PRELIMINARY STATEMENT**

The Government submits this memorandum in connection with the sentencing of defendant Rodolfo Sablon ("Sablon" or the "defendant") and in response to Sablon's sentencing submission filed on March 11, 2019 ("Def. Let."). Sablon pleaded guilty to one count of conspiracy to commit securities fraud and fraud in connection with a tender offer, in violation of Title 18, United States Code, Section 371, pursuant to a plea agreement, in connection with his trading on material nonpublic information ("MNPI" or "Inside Information") obtained from Daniel Rivas ("Rivas"), an employee at Bank of America ("BofA"). Sablon is one of seven defendants charged in a series of three insider trading schemes based on Inside Information supplied by Rivas, which resulted in more than $5 million in profitable trading. Sablon's advisory guidelines range is 37 to 46 months' imprisonment.

The defendant requests a non-custodial sentence. The United States Probation Department ("Probation") recommends a sentence of 1 year and 1 day in prison, the same sentence imposed by this Court on Roberto Rodriguez, the most similarly situated co-defendant to Sablon. The Government believes that a sentence of at least 1 year and 1 day in prison is appropriate to avoid unwarranted sentencing disparities.

**I.    Offense Conduct**

On August 15, 2017, a Grand Jury sitting in this district returned a 54-Count Indictment (the "Indictment") against five defendants, including Sablon. The Indictment centered around Rivas, a technology consultant in the Research and Capital Markets Technology Group at BofA from August 2013 until May 2017, when he was suspended as a result of the criminal investigation. (PSR ¶¶ 24-55.)  In his role, Rivas had access to an internal, proprietary system maintained by

BofA containing MNPI about potential and unannounced merger and acquisition transactions (the "Deal Tracking System"), including tender offers, involving BofA (PSR ¶ 24.) BofA's written policies prohibited the unauthorized disclosure of confidential information, which included the Inside Information. Rivas had a duty, among other obligations, to maintain the confidentiality of all of BofA's confidential information, including the Inside Information. (PSR ¶¶ 24-25.)

The Indictment alleged that from August 2014 through April 2017, Rivas violated the duties of confidentiality he owed to BofA by serially misappropriating material, non-public information from the Deal Tracking System and passing that information along to friends so that they could utilize it to make profitable trades. On more than fifty occasions between 2014 and 2017, Rivas provided Inside Information about contemplated but unannounced merger and acquisition ("M&A") transactions and tender offer transactions involving clients and prospective clients to friends who then used that Inside Information to purchase and sell securities. In total, the criminal scheme resulted in illicit profits of more than $5 million through insider trading in more than two dozen securities.

Specifically, the Indictment alleges that Rivas provided the Inside Information from the Deal Tracking System via three tipping chains.

### The Moode-Siva Tipping Chain

In the "Moodhe-Siva Tipping Chain," Rivas provided Inside Information to James Moodhe ("Moodhe"), the father of Rivas' girlfriend. In turn, Moodhe passed the Inside Information to Michael Siva ("Siva"), Moodhe's broker and financial advisor at Morgan Stanley. The conduct involved in the Moodhe-Siva Tipping Chain is alleged in paragraphs one through twenty of the Indictment, and resulted in trading profits of more than $3 million. (PSR ¶¶ 24-38.)

### The Rivas-Zoquier-Rogiers Tipping Chain

In the "Rivas-Zoquier-Rogiers Tipping Chain," Rivas provided Inside Information to Jhonatan Zoquier ("Zoquier"), Rivas' close childhood friend. Zoquier provided some of that Inside Information to his friend, Rogiers, who had met Rivas and was aware Rivas had accecss to Inside Information. In turn, Rogiers provided the information to at least two additional individuals, one of whom passed the information still further down a chain. The conduct involved in the Zoquier-Rogiers Tipping Chain is alleged in paragraphs fifty-seven through sixty-eight of the Indictment, and resulted in trading profits of more than $500,000. (PSR ¶¶ 49-55.)

### The Rodriguez-Sablon Tipping Chain

In the "Rodriguez-Sablon Tipping Chain," Rivas provided Inside Information to Roberto Rodriguez ("Rodriguez"), Rivas' friend, and Sablon, Rodriguez's co-worker and friend who also developed an independent relationship with Rivas. The conduct involved in the Rodriguez-Sablon Tipping Chain is alleged in paragraphs twenty-one through fifty-five of the Indictment, and resulted in trading profits of more than $2 million.

As relevant to Sablon's sentencing, the Government provides the following additional information about the Rodriguez-Sablon Tipping Chain:

From at least December 2015 until April 2017, Rivas repeatedly passed Inside Information to Rodriguez and Sablon. During this time, both Rodriguez and Sablon resided in Miami, Florida.

In October 2015, during a vacation in Las Vegas, Rodriguez explained to Rivas that his tutoring business was struggling and stated that he had considered trading securities as a source of income. Rivas agreed to help Rodriguez, who had no experience trading, by providing him with tips from BofA. The primary reason Rivas tipped Rodriguez was because Rivas wanted to help

4

his longtime friend. Rodriguez then brought Sablon, his friend and colleague, into the fold and the two opened brokerage accounts and began trading. Shortly thereafter, Rivas traveled to Miami and had lunch with Rodriguez and Sablon. At the lunch, Rodriguez, Sablon, and Rivas discussed plans to trade on the basis of tips from Rivas and to start an investment fund with the proceeds of the illegal scheme. Rodriguez and Sablon told Rivas that if the scheme went well, he could join them in the future to manage the fund.

In addition to providing information in-person, Rivas passed tips to Rodriguez and Sablon via electronic means. At first, they sometimes communicated via phone calls and text messages. In early 2016, Rivas, Sablon, and Rodriguez largely ceased communicating by phone. Rivas tipped Rodriguez and Sablon through an encrypted mobile messaging application called Wikr. Wikr allows users to set a timer for messages to irretrievably "self-destruct."

Rivas tipped Rodriguez and Sablon about more than three dozen relevant transactions. As the scheme progressed, Rodriguez and Sablon often purchased short-term, out-of-the money (i.e., risky) call options to capitalize on the tips. Collectively, approximately 80% of all the securities Rodriguez and Sablon traded from the time they first opened brokerage accounts in December 2015 until April 2017 were based on Inside Information obtained by Rivas through the Deal Tracking System. In total, Rodriguez and Sablon realized more than $2 million by trading in nearly two dozen securities.

## II. Procedural Status of the Defendants

Each of the other four defendants have pleaded guilty to one count of conspiring to commit securities fraud and fraud in connection with a tender offer in violation of Title 18, United States Code, Section 371, with the benefit of a plea agreement, with the following advisory Guidelines

ranges and custodial sentences:

| Defendant | Advisory Guidelines Range | Custodial Sentence |
|---|---|---|
| Michael Siva | 46 to 57 months' imprisonment | 18 months' imprisonment |
| Roberto Rodriguez | 37 to 46 months' imprisonment | 12 months' imprisonment |
| Jhonatan Zoquier | 12 to 18 months' imprisonment | 3 months' imprisonment |
| Jeffrey Rogiers | 18 to 24 months' imprisonment | 3 months' imprisonment |

In addition to the five defendants charged in the Indictment, Rivas and Moodhe were both charged by information, cooperated with the Government's investigation and pleaded guilty to various crimes in August 2017. *United States v. Daniel Rivas*, 14 Cr. 492 (VEC); *United States v. James Moodhe*, 14 Cr. 491 (VM). Following a 5K1.1 motion by the Government, Judge Caproni has sentenced Rivas to a two year term of supervised release plus one hundred hours of community service, to be spent, at least in part, talking to business school or law school students about the risks of insider trading. Moodhe has not yet been sentenced.

**III.    The Guidelines Calculation**

As contained in the parties' plea agreement and determined by the Probation Department in the Presentence Report at paragraphs 65 through 76, the Guidelines range for Sablon's offense of conviction is calculated as follows:

1.    Pursuant to U.S.S.G. § 2B1.4(a), which is the applicable Guideline for insider trading, the base offense level is 8.

2.    Pursuant to U.S.S.G. §§ 2B1.1(b)(1)(I) and 2B1.4(b)(1), the gain from Sablon's offense of conviction is more than $1,500,000 but less than $3,500,000 and thus Sablon's offense level is increased by 16 levels. The base offense level for insider trading is increased by the

"gain resulting from the offense" from the table in § 2B1.1(b)(1). The "gain" is "the total increase in value realized through trading in securities by the defendant and persons acting in concert with the defendant or to whom the defendant provided inside information . . . ." U.S.S.G. § 2B1.4. cmt. Here, the gain consists of the personal trading profits of Rodriguez and Sablon who together received information from Rivas, and shared brokerage accounts, in more than a dozen securities including Monsanto, Twitter, Brocade, Lifelock, Meade Johnson, Diamond Resorts, Outerwall, Panera, Medivation, Raptor and Nimble.

3. Pursuant to U.S.S.G. § 3E1.1(a) and (b), a three level reduction is warranted because the defendant accepted responsibility in a timely manner.

With a total offense level of 21 and a criminal history category of I, the Guidelines provide for a term of imprisonment of 37 to 46 months.

## IV. The Section 3553(a) Analysis

In view of the significant need in this case to reflect the seriousness of the offense, afford just punishment, and promote deterrence and respect for the law, a custodial sentence of at least one year and one day (the term of imprisonment imposed on Rodriguez) is necessary to avoid unwarranted sentencing disparities.

<u>The Nature and Circumstances of the Offense and the Need to Provide Just Punishment</u>

*First*, the nature and circumstances of the offense and the need to provide just punishment weigh in favor of a significant custodial sentence.

A fundamental purpose of the securities laws is to ensure fair dealing and to outlaw deceptive and inequitable practices in the securities markets. The integrity of the capital markets is critical to the functioning of the nation's economy, which depends upon well-functioning

7

markets for liquidity and access to capital. Congress recognized that any deceptive or manipulative practice that influenced or related to trading activity undermined the function and purpose of a free market. Insider trading causes that harm – namely, by undermining the public's confidence in the capital markets, and by suggesting to ordinary investors that they should not invest because those markets are rigged in favor of those who have special access to inside information.

Here, the nature of the offense consisted of persistent, repeated insider trading, over a period of two years, involved dozens of deals and millions in profits. The defendant used covert methods to hide his misconduct, including encrypted messaging, to cover his tracks. The defendant also intended to try and launch a business with the proceeds of his criminal misconduct. Finally, the misconduct was only brought to an end because of the Government's investigation. The serial nature and significant duration of the offense warrants a significant sentence.

<u>The Need for Deterrence and to Promote Respect for the Law</u>

*Second*, a custodial sentence is appropriate to promote respect for the law and afford adequate deterrence. Given the scope of the misconduct in this case, a significant sentence is required to promote respect for the law. The defendant's illegal insider trading took place over the course of nearly two years. Sablon, along with his trading partner Rodriguez, traded profitably in the stocks of eleven different companies and, in total, attempted to conduct insider trading in several more stocks. The scope and duration of Sablon's misconduct reflect a series of considered decisions to break the law, not a one time lapse in judgement. In fact, the insider trading would likely have continued had it not been thrwarted by the Government's investigation. For all these reasons, the defendant's requested sentence of probation does not provide just punishment, nor

8

does it promote adequate respect for the law.

General deterrence is also an important factor. Because insider trading schemes are both highly lucrative and difficult to detect, custodial punishment is necessary to deter others from similar conduct. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."). The non-custodial sentence the defendant seeks would help erode the public's confidence in the integrity of the public markets by sending the message that even when individuals are caught engaging in serial insider trading, they are only lightly punished, so long as they have otherwise been productive, working members of society.

The Need to Avoid Unwarranted Sentencing Disparities

The question of the duration of the sentence required to achieve general deterrence and promote respect for the law is not an easy one. In this case, however, an important consideration is the need to avoid unwarranted sentencing disparities, both between Sablon and his co-defendants – all of whom have received custodial terms of imprisonment – and between Sablon and other insider trading defendants who traded on only a few or even a single occasion.

The Court sentenced Rogiers and Zoquier each to three months' imprisonment. Rogiers and Zoquier were the least culpable in this case. Compared to Rogiers and Zoquier, Sablon and Rodriguez were significantly more involved, for longer, and profited far more than Rogiers or Zoquier. Rogiers and Zoquier together profited approximately $80,000 compared to more than $2 million for the trading engaged in by Sablon and Rodriguez. The Rodriguez/Sablon illicit

trading also involved trading in more stocks, over two years, nearly double the amount of time Rogiers was engaged in misconduct. Unlike Rogiers, Rodriguez and Sablon also used deceptive techniques (such as encrypted messaging apps) to hide their criminal activity. Also unlike Zoquier or Rogiers, Rodriguez and Sablon induced Rivas to continue to pass Inside Information by offering him a potential role in an investment firm Rodriguez and Sablon apparently intended to start using the proceeds of their insider trading schemes. In sum, a significant sentence of incarceration is necessary for Sablon to avoid unwarranted sentencing disparities.

Finally, in recommending a one year and one day custodial sentence, the Probation Department noted: "In formulating our recommendation, we have also considered the sentence imposed for Sablon's co-defendants in order to avoid any unwarranted sentencing disparities. As such, we recommend a term of 366 days' imprisonment. We believe that this term of imprisonment punishes Sablon for his voluntarily involvement in the instant offense while still taking into account the mitigating sentencing factors present in this case as required by 18 U.S.C. 3553(a)." (PSR at 26).

V.   **Defendant's Arguments**

In seeking a non-custodial sentence, the defendant focuses primarily on his personal history and characteristics, on his lack of sophistication in the securities market, and on the fact that Rodriguez had a closer relationship with Rivas then Sablon.

*First*, in describing his history and personal characteristics, Sablon notes that he is a survivor of sexual abuse as a young child who worked hard to put himself through college while working in a mailroom and as a security guard. Sablon explains in detail how he is the sole

caregiver for two of his children with whom he unquestionably has a very close bond,[1] and for his elderly parents.[2] Sablon also details his numerous and substantial contributions to his community, through his work as a teacher, and through a series of initiatives that have been demonstrated to help underprivileged and at-risk youth obtain educational opportunities, stay out of prison, and achieve success.

The letters from Sablon's family members and friends are striking and also truly heartbreaking. They reflect a man who had done much good with his life, from an early age, both for his own family and to help others. These factors certainly warrant consideration, are worthy of credit.

However, these factors do not warrant the non-custodial sentence Sablon seeks. Unfortunately, nearly every defendant who comes before the Court has family who will suffer as a result of the defendant's poor choices and resulting incarceration. Congress, through the Guidelines, as well as federal courts, has addressed and rejected this argument as a basis for the variance. *See* U.S.S.G. § 5H1.6 (family ties and responsibilities not ordinarily relevant). Still, the Government acknowledges that Sablon's relationship with and care for his children does stand out and is likely to be a factor in the Court's determination of the appropriate sentence. Indeed, the Government's consideration of these factors is reflected in the fact that the Government is seeking a below-guidelines sentence. As is relevant here, however, the Court sentenced Rodriguez to one year and one day of imprisonment after taking "into account that he is a war

---

[1] Mr. Sablon's oldest child is nineteen and in college.

[2] As noted in his sentencing submission, Mr. Sablon has other close family in his life, including his sister, Mayda Sablon, and brother-in-law, Maruchi Rodriguez Feo.

veteran who saw serious and dangerous combat, and [] bears both the physical and psychological scars," including PTSD. (Rodriguez Tr. at 20). Thus, a sentence of a year and a day imprisonment would be appropriate given all of the factors, including considering Rodriguez's sentence.

*Second*, Sablon focuses on the fact that he was novice trader pulled into the scheme by Rodriguez, who had the much closer relationship with Rivas. Both Rodriguez and Sablon were unsophisticated in the financial markets and only began trading as a result of the opportunity presented by Rivas. In that regard, Rodriguez and Sablon cannot be distinguished. And while it is true that Rivas and Rodriguez had a closer historical relationship, this fact is of limited relevance given that Sablon developed a direct relationship with Rivas over the course of the conspiracy, to the extent that he operated with full knowledge and did not use Rodriguez as an intermediary. Sablon acknowledges that shortly after being introduced to the opportunity to commit insider trading through Rodriguez, Sablon met directly with Rivas, including at times without Rodriguez. Sablon knew the value of the information he had access to and he cultivated that access for personal gain. Sablon then executed profitable trades on the basis of what he knew was illegal Inside Information. In sum, because Sablon dealt directly with Rivas in obtaining the Inside Information, over an extended period of time, the fact that he did not have a more substantial relationship with Rivas prior to the commencement of the criminal.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that a sentence of at least a year and a day term of imprisonment range would constitute a reasonable and just sentence in this case.

                                                        Respectfully submitted,

                                                        GEOEFFREY S. BERMAN
                                                        United States Attorney

                                    By:          /s/
                                                        Andrea M. Griswold
                                                        Assistant U.S. Attorney

Encl.

cc:     Defense Counsel (by ECF and email)